The clerk may call the next case. No. 184631, MFBW Pumphries v. David A. Chicarelli, et al. There is not a motive at all related to the powers or oral arguments that follow. 15 minutes of discussion. 15 minutes will be shared by the defendant here. Please pass the board. Good morning. May it please the court. Roger Staton, lawyer for Mr. Humphries. I'm from Lebanon, Ohio. Mr. Humphries is here in the courtroom today to your argument. And in this case, there are a lot of former people, former mayor, former police chief, former lieutenant, former police officer. I'll just refer to them by their names throughout my argument. I'm reminded of a. I'm sorry, I should have asked you if I proceed. Yes. I'm reminded of a recent quote that I heard from Warren Buffett. And he said, if a police officer, he actually said, if a cop follows you for 500 miles, you're going to get a ticket. And this case reminds me of that to a certain extent. We have this officer Brooks, Mark Brooks, who was brought on to the Carlyle Police Department as a volunteer, which I'd never heard of before. But he volunteered as a police officer. And within a few months, he had made contact with a young female cousin of the mayor who at that time was Timothy Humphries and invited her for a ride along in his police cruiser. Once again, he's a volunteer. He's not paid. He makes that very clear in his deposition. He's not a paid police officer. And during that ride along, supposedly according to Officer Brooks, Angie Cole, the young female cousin of the mayor, says to Officer Brooks, my mayor or my cousin. Actually, he said that she said my uncle has child pornography on his computer. According to Brooks, he called his lieutenant, Lieutenant Slider in September, October. This was then a couple of months after Brooks came on with the Carlyle Police Department. Carlyle is a little municipality just north of here. And it was a township at the time. He called Slider and according to Brooks and said, oh, guess what? I just heard from the mayor's cousin and told Slider something. Slider denies that the lieutenant denied that. Then there was an election that was coming up in November. This is supposedly in September, October. I won't go into a lot of detail on the facts, but there's an election in November. And according to testimony from Brooks, he calls Chief Bogus and says to Bogus, guess what was told to me? Why haven't you nailed this guy? This is the day before the election in 2009. And Officer Brooks thought that the mayor was running for reelection when in reality, according to the testimony in the record, there were three councilmen who were running that the mayor had supported. The trial court, well, let me get to this point then. After that call to Bogus, the evening before the election where Brooks says, why haven't you gotten this guy? What are you doing? Bogus and Slider the next day, November the 5th, go into the city manager's office, a woman named Sherry Callahan. And they ask if the laptop computer of the mayor is owned by the city. And she says yes. And she takes them down to the, at their request, down to his office. Counsel, you know, we've looked at the facts and the facts are fairly intricate and wide ranging. So you might want to focus on the legal arguments. It appears here that this whole thing started because some of the defendants looked in your client's computer at work and it was the city-owned computer. So arguably they had a right to look into it. After some investigation, it was ascertained that there was not child pornography on the computer. And all the rest of these things that have occurred seem to be political back and forth. Obviously there'd be some impact, a potential impact on your client's reputation. But I'm just wondering why the district judge didn't make the right decision here. I'm trying to figure out, once you reduce this case down to the most basic elements, what is the legal violation of your client's right, that your client has a right to be in court on all this about. I'm trying to figure out where the district judge went wrong. And I'm having trouble coming up with cognizable legal issues that need to go forward in this case to be quite fair. I'm speaking only for myself now. I'm not speaking for the other panel members. But I would like to hear what you have to say as to why, how was your client's rights violated in such a way that there are material factual disputes that should enable this case to proceed? Fourth Amendment violations, Your Honor, of search and seizure. And I'll quote directly from the trial court's decision where the trial court decided, quote, Since that was a government laptop and there was, I believe, a written or public statement that that computer was subject to be, I guess, reviewed, that it was the property of the government. And the person didn't necessarily have particular rights in that. So why is that a violation of the Fourth Amendment? Go ahead. The trial court found that there was a close question as to whether there was a right of privacy. And she went on to resolve that by saying that there was a consent to search the laptop computer that was given by the city manager. And I contend, I know for a fact there is no consent in the record given by the city manager for a search of that computer. That's what I was getting to just a second ago. She went down to the office. She opened the office. The police officers went in. They immediately opened up the computer. The trial court even goes on to say that there may be, even if a reasonable jury could conclude that Humphrey's Fourth Amendment rights were violated. Well, wait a minute now. This was this city-issued computer for work, and it was the computers in the workplace. And why would, what's the basis for the argument that your client would have had a reasonable expectation of privacy with respect to what was on the computer? There were no limitations on his use. He could use it for any personal matters. His office was locked. As the trial court finds in the decision, the trial court finds that it was password protected at the time. Well, the record shows other people had the password as well. From what I, at least they claim they did. They had a password, and that is Ellender, the prior mayor, had a password to the computer. There is nothing in the record to indicate that anything that the mayor would put on there was not protected. But the tip that was given to the city manager was, we hear that he has been looking at child pornography on his home computer. And based upon that, they start looking, the police start looking at the laptop computer that is, as Judge Donald has indicated, government-owned. So there was no indication that the mayor was in any way using the laptop computer. There was no tip. There was no information that would permit the violation of his Fourth Amendment rights to privacy. Now, a lot has been... Which computer are you speaking of? Exactly, Joe. Exactly. I'm speaking of the laptop computer that's in his office, the one that the police officer searched. City-owned computer. The city-owned computer. That's right. That was given to him for his exclusive personal use. The defense has made a deal out of the allegation that someone else had used this for a presentation at one time. They've also made a deal out of the allegation that public records on this could be accessible. That does not indicate that anyone could just walk in and use this without the mayor's permission. This was a computer that was assigned to him directly. It was in his office. It was in his locked office. And there was never a tip or information that would indicate he had done anything improper on this. Why was the computer assigned to the office rather than really to a specific individual? Because from what I remember from the record, once Humphrey was in the position, the laptop that had been used by Ellender was then passed to Humphrey. And, in fact, the same password and same login information was also passed right along with the computer. I would agree with that. That is true. And Ellender testified he had complete free use of it. He let his kids use it. And, in fact, he lied to Chief Bogus about that. This really sounds like, you know, Mayberry modernized, you know, when we talk about just how the operation was done. Oh, well, absolutely. I mean, it certainly has indicated to me never use a used computer. Always make sure that, you know, you get a new computer or something's cleared. Well, maybe your IT manager ought to have IT training. Yeah, they had no IT manager with formal training in this particular municipality. You're correct. But I keep going back. I will go back to this idea that if let's make this assumption that if Slider and Bogus had gone to a magistrate. I'm sorry. When you mention the name Slider and Bogus, I just, you know, it just struck me. I agree. Thank you. If Slider and Bogus had gone to a magistrate with this supposed tip that the mayor had been looking at child pornography on his home computer. Therefore, we want to go in and look at his city issued computer. They would never. They should never get a search warrant to do that. And I think they knew that. And Slider testified that the one case before that he had involving child pornography, he got an affidavit from the tipster. He got not just a bare bones information, you know, about, oh, somebody said that their brother saw something back in 2004, 2005. And that's exactly what he says that he had received. He got an affidavit in that one prior case, went and got his search warrant and then did the investigation. It was an affidavit from the spouse, I think, of the individual who was accused of looking at child pornography. They knew. Slider knew. And Bogus knew. They couldn't get a search warrant for this city-owned computer based upon what they had, that he had been looking at child pornography on his home computer. And actually, that wasn't even. Angie Cole came forward. She's the young lady he took on the ride. And Angie Cole presented an affidavit to the trial court as well as her deposition. I didn't say anything like that to Officer Brooks. That was her sworn testimony. Whether you believe her or you believe Brooks is a matter of, you know, the trial court should not be weighing that testimony in that way. So, you know, and what really sparked me in this case is I have great respect for trial judges. I really do. I've been doing this for 39 years. Most of them are smarter than I am or at least they act as though they're smarter than I am and they present as though they are. And what sparked me in this case is I've read this judge's decision and I've highlighted all these places where she says, well, that's a close question. And there's a lot of facts here that, you know, present a close question as far as the laptop investigation and the tip and the dispute between the parties as to what was said, when it was said, that sort of thing. And that really sparked me in that, wait a minute, that's not the way you decide a motion for summary judgment by saying even if a jury were to decide this. And if you look at this, when the trial judge says in her opinion, even if there is a jury question as to whether there was a violation of the right to privacy, there was consent by the city manager. That's not true. That's not in the record. There was never consent by the city manager to look at this computer or look at anything in this computer. So that's one issue. And I know that we can take a look at this and say, hey, look, the government owned this computer. They could do anything they wanted to do with it. They can they can open it up. They can look at it. They can make allegations based upon what they see there. But that's not the law. That's not just that one single element of ownership can't do it. And, yeah, there were two other little arguments there of one. Well, the Republic records on there. Wouldn't those be accessible? Yeah, probably get the mayor for public records on there. But you go to the mayor and you say, Mayor, you've got a computer there. We know you have public records on there. We have a Freedom of Information Act request. Give us those public records, would you please? And you make that request to him. You don't go into his computer and open it up and start looking at everything. And you should take note of the light.  I just noticed that red. All right. Thank you. I reserve five minutes. Morning, Your Honors. I'm Larry Barbier, and I represent Officers Bogus and Slider and Officer Brooks, too. I think what Mr. Staten is missing in the argument and what the judge decided were close questions. The judge decided whether it was a close question as to whether the plaintiff had a reasonable expectation of privacy in the city-owned computer. And the judge also decided it was a close question as to whether the city manager had consented. Now, the city manager went with them to the office. She unlocked the door to the office. She told them, yes, this is a city-owned computer. She walked in and helped them watch them as they ran this pre-search program. But she said, okay, there's somewhat of a close question on that. And there's somewhat of a close question as to whether there was a legitimate expectation of privacy. But what Mr. Staten hasn't mentioned is we're talking about qualified immunity here. And the qualified immunity analysis we get from Ashcroft v. L. Kidd, which the United States Supreme Court just decided in 2011, says an official's conduct violates clearly established law when at the time of the challenged conduct, the contours of the right were sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Now, the reason the judge was making the comment that this isn't really clear, it wasn't clear to her for sure as to which way she wanted to go, is that certainly it's not clear to every reasonable officer. Now, one thing I didn't say before I started and I should have is I'm going for eight minutes, and then Mr. Pragin is going to go for six minutes after me, and he's going to deal with the motion eliminating argument. I'm sorry about that. All right. So with respect to the analysis, I think it's critical to look at the fact that we're trying to decide if these three officers from the village of Carlisle, which has 5,000 people, violated the plaintiff's clearly established rights. And the law certainly in this area is not clearly established. This computer that the plaintiff was given was the computer, as Your Honor said, that the previous mayor had had, that his kids had used it, he'd used it, he'd used it at the offices, he'd used it at home. It was given to Mayor Humphreys after he took office. He didn't change the password. He used the same password. It was used to give presentations or at least a presentation at the city offices. It was a city-owned computer. It was kept in the city office. The city did have a policy that said you don't have a right to privacy in any of these materials. It all belongs to the city. These are public records that are on this computer, and you have no reason to believe that you have any expectation to a right of privacy. So when Lieutenant Slider and Chief Bozious got this tip that there was a possibility that the mayor was looking at child pornography, I think a reasonable thing to do is to see if there was any of it on the city computer. And not only is that a violation of the criminal law, that would be a violation of the city's policies. Now, the mayor is saying, well, I wasn't subject to the city's policies because I'm not an employee, but the city policies apply to the computers and apply to all the materials on the computers, and they apply to his just as much as they do to everybody else's insofar as these are public records, et cetera. So the fact of the matter is that, yes, if he had pornography of any kind, not just child pornography on that laptop computer, that was a violation of the city policy as well as the fact that it could have been a crime if it was child pornography. Once Lieutenant Slider and Chief Bozious had an opportunity to run this pre-search, which, by the way, is not an intrusive search where they looked at all his emails and all his files or something of that nature. It was a short search where just photographs popped up. Once they had an opportunity to review that, they saw photographs on there that clearly depicted pornography. Now, Chief Lieutenant Slider has testified and testified under oath that he thought several of them involved child pornography, an older person and a child. He knew that they were man-on-man. He knew that they were pornography, and he thought that some of them were man-on-child. So once he'd seen that, once he'd actually – then he has probable cause. And then what does he do? Chief Bozious and Lieutenant Slider don't just charge the mayor with a crime. They call the sheriff and say, what should we do? What's the best way to proceed with our investigation? He said, here's a prosecutor for Warren County who deals with these particular issues. You should speak with her. They met with the prosecutor. The prosecutor drew up a search warrant. The search warrant's true. The search warrant says exactly what Lieutenant Slider saw or thought he saw on the computer. They took the search warrant to the judge, Judge Bronson, who was a very experienced judge in Warren County. And he didn't just sign it. He took the officers into the room. He asked them questions. Then he signed it, and then he sealed it. So they have a search warrant at that point in time. And it was based upon the images that they saw on the computer. Now, once they obtained the computers through the search warrant, they were taken to the FBI. No charges have been filed at this time. The search warrant is sealed. None of my clients have said anything at all about whose computers were taken or anything at all about the investigation. They go to the FBI, to the special unit the FBI has to deal with child pornography. They, Rob White, who was the FBI agent who took a look at this, looks at all the images and meets three times with Chief Bogus and Lieutenant Slider and says, here's 224 images that are clearly pornography that were on this laptop that are the closest ones to whether or not they're child pornography or not. He said, I don't think they're child pornography. And Rob White testified that when he met with Lieutenant Slider and Chief Bogus, they both thought several of them were child pornography. And he said he thought their belief that they were child pornography was a good faith belief. And it was a reasonable belief. What he said was, is in these child pornography cases, you have to identify these people somehow. And these people were not identifiable. And that when they're 15, 16 or 17 years old, it's very difficult to prove. So he didn't think he had a case. He didn't think he had child pornography. But that it was reasonable for my clients to believe that, yes, there was child pornography on that computer. But he also said that with his investigation, he made no – I mean, he didn't opine as to when those images were placed on that computer or in whose possession the computer was at the time they came on there. So he couldn't attribute that to Mr. Humphreys. He couldn't attribute that to anybody. Paul, he knew they might have come on – they might have already been on there when Mr. Humphreys got the computer, correct? Absolutely true, Your Honor. And my clients had no idea when they were on there either. And that's why the investigation stopped immediately. That's why the mayor was never charged with a crime. They were, in fact, already on the computer when Mr. Humphreys got it. I couldn't hear your statement or question. I just asked if they were already on the computer when Mr. Humphreys got them. I don't think that's clear. Mr. Humphreys says that they were. The previous mayor said, I never put them on there. Wasn't there an analysis that produced dates? It's – yes, there was an analysis that said December 27th. And the previous mayor said he gave the computer back in, like, May – December 14th, before December 27th. The IT director said that he thought it was somewhere around December 15th that he had cleaned the computer. But then the mayor said that it was – he got it in 2008. I think that was a question of fact as to when the images were placed on there. But I don't think that applies to my clients because how could they have known? And even with this city computer, it seems to me that it's more than just whether or not the previous mayor or the current mayor put them on there because you have to look at access. And it seems like a lot of people have access to this computer, including family members of the various officials and perhaps friends of the officials. Absolutely true. And that's why, at that point in time, the investigation completely ended. But, you know, they had also, in the meantime, through the search warrant, gotten the home computer of the mayor. And that was to determine if there was any child pornography on the home computer. And it was found that there was pornography on the home computer, but no child pornography. So I would probably submit that it would be very difficult to have proven this with respect to the laptop, that even if there was child pornography on there, that it was from the mayor. But certainly with respect to his home computer, they could have proved that. But the fact is that my clients had no way of knowing that some analysis done years later would show that these photographs were put on perhaps prior to when the mayor took possession. Okay. Is it your position that there's no genuine issue of fact and that the lower court's ruling is correct? And if that is your position, tell me why there's not a question of fact here. That is our position, Your Honor. And our position... I mean, quickly tell me why there's a question of fact. Right. There's no question of material fact. There are some small issues about when did Mark Brooks tell Lieutenant Slider that he had gotten this tip from Angie Cole? What exact words did Angie Cole use when she gave him that tip? I think if you drill down... She said there's no material fact. Right. Because the fact of the matter is that Mark... You say there's no material fact. I thank you. Okay. Thank you very much, Your Honor. Good morning, Your Honors. Good morning. My name is Jamie Pragin. I represent seven of the 11 affilies before you this morning. Before I get started, I'm going to try to leave a minute or so left for Mr. Meyer at the end. He's here to argue the motion to dismiss. And I know he's prepared to submit that on the brief. So if you have any questions for him, certainly let me know and I can wrap up and he's all yours. I wanted to start just by bringing some clarification as to who my clients are and what they have to do with the appeal that's before you. And the short answer is not a whole lot. Three of my clients are the City of Carlisle, Officer Badger and Officer Moore. They are not a part of this appeal. All claims against them were dismissed by Judge Gillotte. None of those claims are discussed in appellant's brief. With respect to Dave Ciccarelli, he is the law director for the City of Carlisle. He is only referenced in this appeal for the purposes of a breach of contract claim, which I'm prepared to submit on the brief, so I don't know that I have a whole lot more to add than what's in the brief, unless you have questions for it. With respect to Jerry Ellender, the former mayor, he is only mentioned in the context of a civil conspiracy claim. He and also Ron Hubbell, the former city manager, he was also mentioned in the context of a civil conspiracy claim and I'll talk just very briefly about that. Sherry Callahan is my other client. She is the city manager for Carlisle. And near as I can tell, she's not really named as far as any claim on this appeal. She's mentioned briefly in the context of that consent issue that the courts already discussed this morning, but there was no Fourth Amendment claim brought against her. Judge Gillotte decided that as well. Certainly we argue that if there was a Fourth Amendment violation claim alleged against her, she'd be entitled to qualified immunity as well. For the same reasons as Chief Bogus and Lieutenant Slider. That's still the case now, but I think you've already touched on it briefly. She didn't run any search. She didn't do anything. Mr. Staten described her role as basically taking the officers down to the mayor's office at the officer's request and unlocking the door. And that's, near as I can tell, not actionable in this case. And that's what Judge Gillotte concluded as well. Now, with respect to the civil conspiracy claim, Judge Gillotte decided that on its merits that it didn't have any merit and dismissed it as well. But she also decided that the intracorporate conspiracy doctrine applied, which kind of makes the merits argument a little academic because the intracorporate conspiracy doctrine certainly disposes of that claim. Well, that's only if the judge appropriately applied it. We'd have to decide if you've got different departments in the city, what would be the applicability of people from different departments from the same entity? And as a municipality, what does the case law say about that? The case law, and I haven't seen distinctions between different departments in the city, the case law says that a city can't conspire with itself. And all the chief players here are either city officials or city employees. And Judge Gillotte decided that that is why the doctrine applied. With respect to the negligence claim against Mr. Hubble, Judge Donald, you mentioned a little bit about the IT person should have training. Mr. Hubble did have 37 years' experience with the federal government as an IT director. So he did have training, he did have a background in IT. You know, there's a question of how thorough of a job he did in cleaning the computer or the laptop. But certainly, Judge Gillotte applied state law immunity to any such claim like that. And that would apply here as well. For immunity to be pierced in this case, an appellant would have to show some malice or ill will by Mr. Hubble in his actions. And there is no evidence like that in the record. And there's no evidence like that identified in this appeal. With that, very briefly, the motion of limiting. That was concerning testimony that was going to be offered by a councilman, Brian Green. There are two privileges that were involved with that. The executive session privilege, which is created under Ohio statute, and the attorney-client privilege. Judge Gillotte found that both of those privileges applied. There were two separate meetings. There was an actual executive session that took place on December 22nd of 2009. And then there was a subsequent meeting in the spring of 2010. The 2009 executive session, I just wanted to be clear that at the outset, there's a two-year statute of limitations under Ohio law for any challenges to the propriety of an executive session. And the clock struck midnight on that in December 22nd of 2011. And there were no challenges brought with respect to the executive session until depositions were occurring in this case in 2012. So our position is any challenges to that would be waived. Unless the court has any questions about the motion in limiting, I'm prepared to submit that on my brief. And with that, any questions for Mr. Meyer, I'll yield to him. Thank you very much. May I please support Andrew Meyer on behalf of the appellee, Blake Ellender. Unless there's any specific questions regarding the merits of the appeal in my response brief, I'm prepared to submit on the briefs. All right. Thank you very much. Thank you. I just heard that there was a policy of expectation of regarding expectation of privacy in the city of Carlyle. There was no such policy. Mr. Humphreys was not put on notice that anything could be searched on this computer or anyone would have access to this. They're referring to AR-9, which was a rule that was passed by council regarding employees, AR-9. I refer to this in my reply brief. And that deals only with e-mails of employees and that an e-mail would go through a server and they could look at the e-mails and that they have to be for government purposes, that sort of thing. There is no policy. There was no policy at the time regarding the use of this computer. It was given to the mayor and the mayor was told, use this computer for your official duties here. And Mr. Hubbell was not an IT manager. There's nothing in the record to indicate that. Even the trial court judge picked up on this and she said he had no formal IT training. There can be liability for tort, for negligence under not just ill will and bad faith, but the second provision. And that is if the employee and the trial court pointed this out, the employee's acts or admissions were manifestly outside the scope of the employee's employment or official responsibilities. That's under Chapter 2744 of the Ohio Revised Code. And the trial court picked up on that. Mr. Hubbell was acting outside of the scope of his official responsibilities. The intracorporate, the intracorporate. How was he acting outside of his responsibilities? He was the financial director. That's pure and simple. That was his role. That was what he was paid for by the city of Carlisle, the village of Carlisle. He was the finance director. Was there something that said his duties were limited exclusively and specifically to matters of finance? Well, that would be a factual issue. But there was no testimony that he could do anything other than being the financial director. This court has recently, the Sixth Circuit has recently dealt with the intracorporate conspiracy doctrine and cited the Vivian Johnson case, which was 1994 Federal Appellate 0388P. I'm sure you're familiar with the case. But in part of the headnotes of that, when employees of corporations act outside the course of their employment, they and the corporation may form a conspiracy under Civil Rights Statute 42 U.S.C.A. 1985. And, of course, it could be under 1983 also. We have an affidavit in the record from a Philip Cole that had Brooks, who is an outsider, a volunteer, cursing the mayor and having ill will toward the mayor, which certainly would be outside his scope of a police officer or volunteer or anything of that sort. Let's deal just briefly, I know I have limited time, let's deal just briefly with the motion in limine, where the trial court completely threw out my affidavit, threw out the deposition of Brian Greene, not my affidavit, but Brian Greene's affidavit and deposition, where the law director specifically said, I have a personal vendetta against the mayor. I know I can't get him for a crime, but I want him to be recalled. And this was not an executive session. It was not a legal session. I quote before the court section 7.22 of the Ohio Revised Code, which is the general laws of Ohio, which provides that all these meetings must be open to the public. And there is nothing in the Carlisle Charter which provides for executive sessions. So the trial court said, oh, well, there's general language that says the Ohio general laws apply to executive sessions. Well, is that right? If that's the case, then 7.22 of the Ohio Revised Code provides that all meetings must be open to the general public. And all these meetings were not open, yet the trial court says, well, you have no evidence, Mr. Staten and Mr. Humphreys, that there was any ill will or anything untoward from the law director. No, Judge, we don't have any evidence because you threw it out on a motion in limine. And then you grant a summary judgment all the time, finding that, you know, there are material issues of fact. And I will contend that when you have a tip that is relayed by a police officer that is totally false. And it's acted upon by slider and bogus to look at the laptop computer. That is a material issue of fact as to who's telling the truth in that particular instance. Thank you very much. Thank you. The case is submitted. The final case being on the briefs, you may adjourn court.